IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

JERRY GREEN,                              )
                                          )
          Plaintiff,                      )
                                          )
     v.                                   )     CIVIL CASE NO.: 1:19-cv-874-ECM
                                          )               (WO)
THE HENRY COUNTY                          )
COMMISSION,                               )
                                          )
          Defendant.                      )

## MEMORANDUM OPINION and ORDER

## I.     INTRODUCTION

Plaintiff Jerry Green ("Green") brings this retaliation and race discrimination suit pursuant to 42 U.S.C. § 1981 against the Defendant, the Henry County Commission ("the Commission").[1]   Green, a former custodian for Henry County buildings, alleges race discrimination and asserts that the Commission retaliated against him for complaining about racially discriminatory treatment at the workplace.

Now pending before the Court is the Commission's motion for summary judgment. (Doc. 38).  Green has filed a response in opposition to the motion, (doc. 41), and the motion is ripe for review.

For the following reasons, the motion is due to be GRANTED.

---

[1] The Plaintiff brought a four count complaint against the Henry County Commission alleging (1) retaliation under 42 U.S.C. § 1981 and Title VII; (2) age discrimination under the Age Discrimination in Employment Act ("ADEA"); (3) race discrimination under Title VII; and (4) race discrimination under 42 U.S.C. § 1981. The Title VII claim in Count One, the ADEA claim in Count Two, and the Title VII claim in Count III were previously dismissed by the Court. (Doc. 18).  However, Counts One and Four remain to the extent that they were brought pursuant to 42 U.S.C. § 1981.

## II.    JURISDICTION

The Court exercises federal subject matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1331.

Personal jurisdiction and venue are uncontested.

## III.    STANDARD OF REVIEW

A reviewing court shall grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a).  The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56).  The movant can meet this burden by presenting evidence demonstrating there is no dispute of material fact, or by showing that the non-moving party has failed to present evidence in support of some element of his case on which he bears the ultimate burden of proof. *Id*. at 322–23.  Only disputes about material facts will preclude the granting of summary judgment. *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 249 (1986).  "An issue of fact is 'genuine' if the record as a whole could lead a reasonable trier of fact to find for the nonmoving party. . . . An issue is 'material' if it might affect the outcome of the case under the governing law." *Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1496 (11th Cir. 1996) (quoting *Anderson*, 477 U.S. at 248).

2

Once the movant has satisfied this burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-movant must support his assertions "that a fact cannot be or is genuinely disputed" by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B).

In determining whether a genuine issue for trial exists, the court must view all the evidence in the light most favorable to the non-movant. *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003). Likewise, the reviewing court must draw all justifiable inferences from the evidence in the nonmoving party's favor. *Anderson*, 477 U.S. at 255. However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam).

A reviewing court is constrained during summary judgment proceedings from making the sort of determinations ordinarily reserved for the finder of fact at a trial. *See Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012). After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a).

3

## IV.   BACKGROUND

The Henry County Commission is the governing body for Henry County, Alabama. The Commission operates the Henry County Courthouse ("the Courthouse") and sets a budget to hire employees to manage the Courthouse and other County buildings.   On November 1, 2005, the Commission hired James Lynn ("Lynn"), an African American man, as a custodian for the County buildings. (Doc. 39-2 at 2).[2]  Then, on February 6, 2006, the Commission hired Green, also an African American man, to work as a custodian for the County. (*Id.* at 4).

### A.  The Plaintiff's relationship with Jerry Whitehead

In Henry County, the Probate Judge is the Chair of the County Commission and manages the operations of the Courthouse.   In 2012, the Probate Judge was Judge JoAnn Smith, and the Sanitation Supervisor was Jerry Whitehead, a white man.   As Sanitation Supervisor, Whitehead was the direct supervisor of Green—who, according to Green, in turn supervised Lynn. (Doc. 41-4 at 2) ("Mr. Whitehead told me I was Mr. Lynn's supervisor, but nothing was put in writing.").   Green alleges that Whitehead engaged in abusive and racially derogatory treatment of him.   Green alleges that Whitehead harassed him, subjected him to unfair attempts to discipline, and directed racially discriminatory actions towards him. (*Id.* at 3).   A write-up dated April 13, 2012 contains a responsive statement by Green that Whitehead was "very racial." (Doc. 39-1 at 6).

---

[2] The Court will refer to the page numbers generated by CM/ECF.

Judge Smith was succeeded by Probate Judge David Money, and Green alleges that, "[p]rior to Judge Money's election, I complained to him that Mr. Whitehead was treating me in a racially discriminatory manner. . . . Judge Money assured me he would handle the situation once he took office." (Doc. 41-4 at 3). However, Whitehead's alleged mistreatment of Green continued after Judge Money took office: Whitehead allegedly continued to interrupt Green's work and speak to Green in an inappropriate manner, repeatedly encouraging Green to leave his job. Green states that "[w]hen I objected to his treatment, he treated me even worse." (*Id.* at 7). In 2013, Whitehead proposed disciplinary action against Green, and Judge Money subsequently spoke to both Green and Whitehead about turning over a new leaf in their relationship. (*Id.*).

According to Green, he again complained to Judge Money that Whitehead was discriminating against him, but nothing changed. (*Id.* at 4). Soon after, Green claims that Judge Money also treated him in a discriminatory manner: "[once] Judge Money [took] office, he began treating me critically . . . . I did not see him treating white employees this way." (*Id.*).

In 2015, Ronnie Dollar became the Henry County Personnel Director, acting as a supervisor to both Whitehead and Green. But, even with Dollar now serving as a buffer between the two, the relationship between Whitehead and Green only deteriorated further over the next year. Their regular spats finally escalated to an argument in a public area of the Courthouse in 2016. It is disputed what happened during the argument, but both Parties agree that Dollar addressed the incident. (Doc. 41-4 at 8). Dollar removed Whitehead as Green's supervisor, and Dollar became Green's supervisor instead. Green alleges that

5

Whitehead continued to harass him anyway, and, "[s]ometime in March or April 2017 I complained to Judge Money that Mr. Whithead [sic] was looking for a way to discipline me, and I felt it was racial." (Doc. 41-4 at 4). Judge Money claims he did not receive any complaints from Green regarding racially discriminatory treatment.

### B. The upkeep of the County buildings

In the meantime, the Commission claims that the cleanliness of County buildings deteriorated over the years. According to Judge Money, "maintenance was lacking" throughout the buildings and grounds, and the Commission "received complaints from the public and from others occupying those offices. At one point in time, things were so bad that [Judge Money's] wife actually cleaned the bathrooms on a Sunday afternoon while [he] worked." (Doc. 39-1 at 3–4). The Commission states that the cleanliness got better for a time, but that Judge Money "saw Green and Lynn just sitting around the Courthouse taking very long breaks," which he felt "was a waste of money." (*Id.* at 4). Judge Money then determined "Green and Lynn were both more productive and efficient when they worked separately. [He] began to suspect that one of them would do a better job by himself." (*Id.* at 5). In turn, Green alleges, "Judge Money did not seem to have any issue with white employees taking their breaks outside smoking and talking, but he had an issue with Mr. Lynn and me taking our breaks in the same place. JudgeMoney [sic] and Mr. Dollar told us we had to take our breaks downstairs and not be seen by the public." (Doc. 41-4 at 8–9). And he adds, "[w]e wanted to be able to take our breaks in the fresh air like the white employees." (*Id.*).

6

### C. The Commission's decision to eliminate a custodial position

Judge Money ultimately decided to recommend that the Commission eliminate one of the custodian positions.  While Green's salary was included in the budget the Commission passed in September 2016, the Commission held a meeting on April 11, 2017 in which it voted to eliminate one custodial position from the Courthouse.  Specifically, Judge Money told the Commission that there was not enough work for two custodians.[3] After the discussion, "Commissioner Beasley made a motion, seconded by Commissioner Grimsley, to add the issue to the Agenda. . . . [Judge Money] then requested that the Commission eliminate one of the custodian positions, with the decision based on seniority." (Doc. 39-1 at 5).  The Commission unanimously voted for Judge Money's proposal to eliminate one position: the less senior custodian on the team.  The Commission drafted a notice to Green, signed by Judge Money on the same day—April 11, 2017—, that the Commission "voted unanimously to eliminate one position in the court house, annex and grounds custodial department." (Doc. 39-9 at 7).  The notice reads, "[t]his decision was based on the fact that there is not enough work to be done to warrant two full time employees." (*Id.*).

Importantly, the Commission states that Judge Money believed at the time he made this proposal to the Commission that it would be Lynn, not Green who would lose his job. Judge Money's affidavit reads, "[w]hen I first began thinking that we should probably

---

[3] The meeting minutes read, "[a]fter discussion of janitorial/grounds maintenance and the lack of work to keep two people busy, Benton Beasley made a motion seconded by Henry Grimsley and a unanimous vote of the Commission for this item to be added to the agenda." (Doc. 39-9 at 3).

eliminate the position, I had actually assumed that Jerry Green had more seniority because he was the older of the two custodians, which meant that Lynn would be the one let go." (Doc. 39-1 at 5).  Dollar similarly provides that he assumed Green was the senior employee. (Doc. 39-3 at 3).  However, Green was hired three months *after* Lynn, and thus, because Green was hired after Lynn, Green's job was eliminated, and he was placed on layoff status effective May 2, 2017.  Green does not dispute that Judge Money and Dollar thought he was the senior employee leading up to and during the April 11, 2017 meeting. (Doc. 41-4 at 9).[4]

Green's dealings with the Commission did not end there.  On April 22, 2017, Dollar approached Green to tell him that Dollar could help Green get his job back if he "would do what [he] was told." (Doc. 41-4 at 5).  And, on May 9, 2017, Green attended a Commission meeting to ask about why his job had been eliminated without due process in accordance with the employee policies and procedures.  Green also had at least eight former co-workers sign a document saying that "lack of work" and Green's job performance were not the real reasons for Green's losing his job.[5] (Doc. 39-10 at 2–10).  Neither Green nor the co-workers

---

[4] Green's affidavit reads,

> I have reviewed the Defendant's Brief in Support of its Motion for Summary Judgment. In factual paragraph 18 where the Henry County Commission alleged that they thought I had more seniority over Mr. Lynn because I was older. He was my subordinate in that I did work on the grounds and in the courthouse and annex where he did not do grounds work. I supervised him. Nothing was said to me about seniority, and the fact that Mr. Dollar told me my job could be saved showed that seniority was not a factor.

(Doc. 41-4 at 9).

[5] Each signature is beneath the statement:

asserted that race discrimination was the real reason for the employment action.  Green offers that he did not mention race discrimination at the time of his termination "because it was clear I had been fired for complaining of dsicrimination [sic]" and "because [the Commissioners] were the ones who made the decision—there was not a point in complaining to them that they were acting unlawfully and it would only inflame the situation." (Doc. 41-4 at 10).

## V.      DISCUSSION

Green brings two counts pursuant to 42 U.S.C. § 1981, alleging retaliation and discrimination.  Before the Court addresses each in turn, it will review the Parties' objections to several exhibits.

### A. Evidentiary Objections

Both Parties object to exhibits submitted with or in response to the motion for summary judgment: they object to declarations, a job offer document, and a newspaper article.

---

I believe that Mr. Green was given false statements as to why he was terminated.

I know Mr. Green and worked with him here in the Henry County Courthouse, and do not believe it had anything to do with a 'lack of work' issue or his job performance.

It was solely a personal vendetta against Mr. Green by Judge David Money who got Mr. Ronnie Dollar, Personnel Director, and the Henry County Commission to go along with.

(Doc. 39-10 at 2).

Specifically, Green objects to portions of Judge Money's declaration, (doc. 39-1), as inadmissible hearsay and speculation, to portions of Ronnie Dollar's declaration, (doc. 39-3), as hearsay and improper speculation, and to the documents relating to Green's 2021 job offer from the Commission, (doc. 39-12), as irrelevant. (Doc. 41 at 17–20). Declarations or "affidavits offered in support of or in opposition to a motion for summary judgment 'shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.'" *Moore v. Beneficial Nat. Bank USA*, 876 F.Supp. 1247, 1254 (M.D. Ala. 1995) (quoting Fed. R. Civ. P. 56(c)(4)) (emphasis removed). "[A] district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form." *Macuba v. Deboer*, 193 F.3d 1316, 1323 (11th Cir. 1999) (internal quotations omitted). Here, Judge Money and Dollar's testimony could be reduced to admissible form at trial. Accordingly, the Court declines to strike any portion of their respective affidavits.

Green asserts that evidence regarding the 2021 job offer to Green is irrelevant and objects to thereto. A piece of evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence." FED. R. EVID. 401(a). The Henry County Commission responds with examples of ways in which this evidence is relevant. The Court finds that this evidence may be relevant and overrules Green's objection.

The Commission objects to a newspaper article submitted by Green, (doc. 41-3), as inadmissible hearsay. (Doc. 42 at 1–2). The Commission further asks the Court to strike

the article from the record.  While the Court does not consider the newspaper accounts to be of substantial evidentiary value, the Court will not strike the article at this time because information within the article could be reduced to admissible evidence at trial. *See Woods v. Dunn*, 2020 WL 1015763, at *9 (M.D. Ala. Mar. 2, 2020) (citing *Macuba*, 193 F.3d at 1323).  Accordingly, the Commission's objection is overruled.

### B.  Count I – Retaliation

The Court now turns to Green's 42 U.S.C. § 1981 retaliation claim.  Retaliation claims brought under § 1981 are analyzed under the same framework as their Title VII counterparts, *Gogel v. Kia Motors Manufacturing of Ga., Inc.*, 967 F.3d 1121, 1134 (11th Cir. 2020) (en banc), and they therefore are subject to the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) burden-shifting analysis.

### 1.  *Green has established a* **prima facie** *case of retaliation.*

A *prima facie* case of retaliation under § 1981 requires a plaintiff to show "(1) that '[he] engaged in statutorily protected activity,' (2) that '[he] suffered an adverse action,' and (3) 'that the adverse action was causally related to the protected activity.'" *Id.* (quoting *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 924 (11th Cir. 2018)).  When the plaintiff establishes a *prima facie* case of retaliation, there is a "presumption that the adverse action was the product of an intent to retaliate." *Bryant v. Jones*, 575 F.3d 911, 924 (11th Cir. 2009).  Next, the burden shifts to the employer to rebut this presumption by "articulating a legitimate, non-[retaliatory] reason for the employment action." *Gogel*, 967 F.3d at 1135.  If the employer successfully does so, then the burden shifts back to the plaintiff to demonstrate that the "proffered reason was merely a pretext to mask [retaliatory] actions."

*Bryant*, 575 F.3d at 1308.  It is at this crucial stage that the plaintiff must establish but-for causation: he must demonstrate that his "protected activity was a but-for cause of the alleged adverse action by the employer," *Univ. of Tx. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013), or, in other words, he must show that he would not have been fired if he had not engaged in the protected activity. *Gogel*, 967 F.3d at 1135.  The burden of persuasion remains on the employee throughout. *Id.*

Green presents a *prima facie* case of retaliation here.  First, both Parties agree that Green suffered an adverse employment action when he lost his job in April 2017.  Second, viewing the facts in the light most favorable to Green, he engaged in a statutorily protected activity.  Green claims that complained to the previous Probate Judge and to Judge Money about racially discriminatory treatment directed by Whitehead towards Green. Specifically, Green made a written complaint about "racial" behavior in 2012, (doc. 39-11 at 2), Green says he complained to Judge Money about racially discriminatory treatment before and after Judge Money took office, and Green claims that he made a similar verbal complaint to Judge Money within a short window of time before he was fired—"either in the month he was terminated or the preceding month." (Doc. 41 at 24).  "[A]n employee has engaged in protected activity if she has: (1) opposed an unlawful employment practice, or (2) 'made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing' under [§ 1981]." *Smith v. City of Fort Pierce, Fla.*, 565 F. App'x 774, 777 (11th Cir. 2014) (quoting *E.E.O.C. v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1174 (11th Cir. 2000)).  Both formal and informal complaints about discriminatory treatment are considered protected activities. *See Rollins v. State of Fla. Dept. of Law Enforcement*, 868

F.2d 397, 400 (11th Cir. 1989).  Therefore, Green's alleged complaints, both in writing and verbally to Judge Money, sufficiently establish that Green engaged in a statutorily protected activity.

Regarding the third prong of the *prima facie* case, the close temporal proximity between Green's alleged complaints and the adverse employment action is sufficient to establish a causal link between the two.  But-for causation is addressed later in the *McDonnell Douglas* burden-shifting analysis. *Gogel*, 967 F.3d at 1136 (en banc).  Thus, it is sufficient at this stage for Green to show "the decisionmaker was aware of the protected conduct at the time of the adverse employment action," *Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000), and that "the adverse actions were not wholly unrelated." *Smith*, 565 F. App'x at 778 (cleaned up).  This can be shown through "close temporal proximity between the employer's awareness of the protected conduct and the adverse employment action." *Hill v. Manning*, 236 F. Supp. 2d 1292, 1300 (M.D. Ala. 2002) (citing *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1336 (11th Cir. 1999)). Although "[a] three to four month disparity between the statutorily protected expression and the adverse employment action" is insufficient to establish causation, *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007), one month probably is enough.  Here, Green asserts that he complained to Money about Whitehead's racially discriminatory conduct either in March or April 2017, and the Commission, on Money's recommendation, voted to remove his job on April 11, 2017.  This close temporal proximity establishes a causal relationship sufficient for the purposes of a *prima facie* case of retaliation.

13

### 2. *The Commission has proffered a legitimate, non-discriminatory reason for its action.*

Having established a *prima facie* case, the burden shifts from Green to the Commission to proffer a "legitimate, non-discriminatory reason for the employment action." *Gogel*, 967 F.3d at 1135. The Commission asserts that neither of the two custodians was fully productive, and "the Commission simply could not justify continuing to pay two people to do what amounted to a half of a job each . . . ." (Doc. 39 at 10–11). The Commission voted to eliminate one custodian position based on seniority. Because the Defendant has articulated a non-discriminatory reason for its action, the burden shifts back to Green to show that the reason is pretext for retaliation.

### 3. *Green cannot establish but-for causation.*

To establish pretext, Green must demonstrate that the *Commission* would not have fired him, but for his complaint of race discrimination. *Gogel*, 967 F.3d at 1136. Green presents no evidence that the Commissioners had retaliatory motives or even knew about his alleged protected activity. Instead, he relies on a cat's paw theory of liability—that the Commission's decision to eliminate his position was determinatively influenced by the recommendations of Judge Money, who Green claims did have an impermissibly retaliatory motive.[6]

"'Cat's paw' theory of liability, also referred to as 'subordinate bias theory,' is liability seeking to hold an employer liable for the animus of a supervisor who was not

---

[6] Green makes much of the fact that a budgetary line item had already been created for his salary, which the Commission voted to remove on April 11, 2017 when it removed his position. But the Commission is correct in arguing that it legally can make changes to its budget throughout the year. *See* ALA. CODE § 11-8-3.

charged with making the ultimate employment decision." *Sims v. MVM, Inc.*, 704 F.3d 1327, 1335 n.6 (11th Cir. 2013) (quoting *Staub v. Proctor Hosp.*, 562 U.S. 411, 415 (2011)).  The cat's paw theory is applied regularly to retaliation claims. *See, e.g.*, *Crayton v. Pharmedium Servs., LLC*, 213 F. Supp. 3d 963, 984–85 (W.D. Tenn. 2016) (applying the cat's paw theory to a § 1981 retaliation claim); *Russaw v. Barbour Cnty. Bd. Of Educ.*, 891 F. Supp. 2d 1281, 1285 (M.D. Ala. 2012) (applying the cat's paw doctrine to a Title VII retaliation claim). *See also E.E.O.C. v. EmCare, Inc.*, 857 F.3d 678, 684 n.3 (5th Cir. 2017) (noting that retaliation plaintiffs "may use a cat's paw theory to prove causation when they cannot show the official decisionmaker had a retaliatory motive, but can show that another individual influenced that decisionmaker").

"Under the cat's paw doctrine, a plaintiff may establish but-for causation if she shows that the unbiased decision-maker (here [the Commission]) followed a 'biased recommendation without independently investigating the complaint against the employee.'" *Godwin*, 615 F. App'x at 528 (quoting *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999) (per curiam)).  In such a situation, "the recommender is using the decisionmaker as a mere conduit, or cat's paw[,] to give effect to the recommender's discriminatory animus." *Stimpson*, 186 F.3d at 1332.  Essentially, the decision-maker acts as a "rubber stamp." *Id.*  But, if an employer undertakes its own independent investigation to consider the recommendation, the investigation will be a factor supporting the employer's argument that it should not be liable. *Russaw*, 891 F. Supp. 2d at 1283 (quoting *Staub*, 562 U.S. at 421).  Regarding the extent to which an independent investigation is required, the Supreme Court reviewed the application of cat's

15

paw liability to the Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA") in *Staub v. Proctor Hosp.*, 562 U.S. 411, 415 (2011). The Court analyzed the USERRA claims similarly to those under Title VII and determined whether an independent investigation could prevent an employer from being held liable under a cat's paw theory, holding,

> the requirement that the biased supervisor's action be a causal factor of the ultimate employment action incorporates the traditional tort-law concept of proximate cause. . . . Thus, if the employer's investigation results in an adverse action for reasons unrelated to the supervisor's original biased action . . . , then the employer will not be liable. But the supervisor's biased report may remain a causal factor if the independent investigation takes it into account without determining that the adverse action was, apart from the supervisor's recommendation, entirely justified. We are aware of no principle in tort or agency law under which an employer's mere conduct of an independent investigation has a claim-preclusive effect. Nor do we think the independent investigation somehow relieves the employer of "fault."

*Staub*, 562 U.S. at 420–21 (internal citations omitted). From *Staub*, it can be taken that conducting an independent investigation may mitigate liability under a cat's paw theory, but it will not automatically prevent an employer from being held liable. Essentially, the cat's paw theory provides that "[t]he employer is at fault because one of its agents committed an action based on discriminatory animus that was intended to cause, and did in fact cause, an adverse employment decision," even if some level of independent investigation occurred. *Id.* at 421.

Here, the Commission voted unanimously to eliminate one of the custodial positions from the budget based on the recommendation of Judge Money at the April 11, 2017 board

meeting.  The meeting minutes show that there was a public discussion regarding the budget and upkeep. (Doc. 39-9 at 3).  Further, Dollar testified that he spoke to the Commission at the April 11, 2017 meeting on the issue. (Doc. 39-3 at 3).  Thus, some form of independent investigation appears to have been conducted, although not one that would have a "claim preclusive effect." *Staub*, 562 U.S. at 421.

Accordingly, the issue is whether Judge Money harbored retaliatory animus when he made his recommendations to the Commission, causing the adverse action. *See Hinton v. Ala. State Univ.*, 2020 WL 6946449, at *7 (M.D. Ala. 2020) (denying summary judgment based on the application of the cat's paw theory to a race discrimination claim pursuant to Title VII).  Moreover, Judge Money's alleged retaliatory animus must be the but-for cause of Green's termination.  *Gogel*, 967 F.3d at 1136 ("[I]n determining whether the plaintiff has met [his] burden to show pretext, we remain mindful that it is the plaintiff's burden to provide evidence from which one could reasonably conclude that but for [his] alleged protected act, [his] employer would not have fired [him].").

This is where Green fails to meet his evidentiary burden—he does not present evidence to establish but-for causation.  Green does not present evidence that Judge Money's recommendation to the Commission was motivated by Green's alleged protected activities—his complaints.  Notably, Green does not dispute that Judge Money (and Dollar) thought he, not Lynn, was the senior employee when Judge Money recommended that the Commission eliminate the most subordinate custodian position. (Doc. 41-4 at 9).  In fact, according to Judge Money and Dollar—and *undisputed* by Green—they assumed at all times until the meeting was over that Green was the senior employee.  Green himself

understood that he was the senior custodian. (Doc. 41-4 at 2) ("Mr. Whitehead told me I was Mr. Lynn's supervisor, but nothing was put in writing.").  Green's retaliation claim falls short because he presents insufficient evidence to show that *he* was targeted for termination or that Money's recommendation was motivated by retaliatory animus. Indeed, Green does not present evidence to demonstrate that Judge Money would not have recommended to terminate one custodial position but for his alleged retaliatory animus against Green.  And without that evidence, there is an insufficient causal connection between any protected activity and the adverse employment action.

In sum, there is not a genuine dispute of material fact as to whether Judge Money— and therefore the Commission—was motivated to act in a retaliatory manner.  Accordingly, the motion for summary judgment will be granted as to Count I.

### C.  Count IV – Discrimination

Green also brings a race discrimination claim pursuant to 42 U.S.C. § 1981.  There is no direct evidence of discrimination, so Green's § 1981 race discrimination claim is analyzed under the *McDonnell Douglas* burden-shifting framework.  Pursuant to § 1981, "[a]ll persons . . . shall have the same right . . . to make and enforce contracts, to sue, be parties, [and] give evidence . . . as is enjoyed by white citizens." 42 U.S.C. § 1981.  The Supreme Court, in its recent decision in *Comcast Corp. v. National Association of African American-Owned Media*, 140 S.Ct. 1009 (2020), held that in order to prevail on claims under § 1981, plaintiffs must establish but-for causation. *Id.* at 1014 (holding, "a plaintiff must demonstrate that, but for the defendant's unlawful conduct, its alleged injury would not have occurred").  Accordingly, the § 1981 plaintiff bears the burden of demonstrating

that "race was a but-for cause of its injury," or that "the defendant would have responded differently but for the plaintiff's race . . . ." *Id.* at 1014–15.

As an initial matter, the Parties dispute whether the Court should look for a "reduction in force" *prima facie* case (the Commission's argument) or a termination *prima facie* case (Green's argument). The Court is aware that "[m]ore than one formulation of the elements of a prima facie case exist." *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1275 (11th Cir. 2008). Here, in the Complaint, the Plaintiff identifies Count IV as a termination claim, (doc. 1 at 8), and Green is the only employee who lost his job at the April 11, 2017 meeting, suggesting the meeting resulted in a termination, not a reduction in force. But the Commission claims that it voted on April 11, 2017 to reduce the number of custodians without considering who would be terminated—Green or Lynn—and, therefore, the decision was a reduction in force. The Court need not resolve this dispute, however, because it finds that, under either analysis, Green does not establish a *prima facie* case of race discrimination.[7]

To establish a *prima facie* case for the more particularized reduction in force claim, the plaintiff must prove that "(1) [he] is a member of a protected class and was adversely affected by an employment action; (2) [he] was qualified to assume another position at the time of the discharge; and (3) the employer intended to discriminate in reaching the employment decision at issue." *Felder v. Bradford Health Servs.*, 493 F. App'x 17, 19 (11th Cir. 2012) (citing *Barnes v. Sw. Forest Indus., Inc.*, 814 F.2d 607, 609 (11th Cir.

---

[7] Nowhere does the Plaintiff assert a cat's paw theory of liability for his race discrimination claim. Even if he did, his race discrimination claim would fail for the reasons set forth herein.

1987)).  It is undisputed that Green meets the first prong.  Regarding the second prong, the Commission argues that Green could not have taken another position at the time of discharge because none were available at that time.  But the Commission subsequently offered Green another position in January 2021, which suggests that he would have been qualified to assume another position, had one been open.

Even assuming Green could establish the second prong, his claim certainly fails at the third prong: he has presented no evidence to show that the Commission intended to discriminate in reaching the employment decision of eliminating his position.  As evidence of intent to discriminate, Green offers:

> Mr. Green points to the difference in the way Judge Money and Mr. Dollar treated him compared to white employees. Judge Money was critical of Mr. Green, questioning him about how he did his job but did not direct the same scrutiny toward white employees. Judge Money and Mr. Dollar tried to hide Mr. Lynn and Mr. Green from the public during their breaks while permitting white employees to take breaks in public areas.

(Doc. 44 at 4, para. 17, and 8–9, para. 44).  Viewed in favor of the non-moving party, this evidence does not establish that the *Commission* acted with a racially discriminatory motive when it made the employment decision at issue.  In fact, Green presents no evidence to establish racially discriminatory motives by the Commissioners *when it made the April 11, 2017 decision*.  "[U]nsubstantiated assertions alone are not enough to withstand a motion for summary judgment." *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1529 (11th Cir. 1987).  Green's claim of race discrimination during a reduction in force fails at the *prima facie* stage.

Nor does Green establish a *prima facie* claim of race discrimination based upon termination. Regarding a termination claim, "a plaintiff may establish a prima facie case of discrimination by demonstrating that: (1) he is a member of a protected class; (2) he was subjected to an adverse employment action; (3) his employer treated similarly-situated employees outside of his class more favorably; and (4) he was qualified for the job." *Connor v. Bell Microproducts-Future Tech, Inc.*, 492 F. App'x 963, 965 (11th 2012) (per curiam) (citing *Burke-Fowler v. Orange Cnty., Fla.*, 447 F.3d 1319, 1323 (11th Cir. 2006) (addressing Title VII race discrimination)). As previously discussed, Green is a member of a protected class who was subjected to an adverse employment action. Additionally, he can establish that he was qualified for the job.

However, Green fails to establish a *prima facie* case of discrimination because he has presented no evidence that his "employer treated similarly-situated employees outside of his class more favorably." *Id.* To successfully establish this prong, a race discrimination plaintiff must produce evidence of a comparator who is "similarly situated in all material respects" but received more favorable treatment. *Lewis v. City of Union City*, 918 F.3d 1213, 1218 (11th Cir. 2019) (listing examples of how plaintiffs can establish a comparator). Green produces no evidence of valid comparators to show he was treated less favorably due to his race. Beyond his general statement that white employees were treated better, (doc. 41 at 29–30), Green offers no evidence to show who these employees were or how they were similar to him in *any* respect, let alone all material respects. In the absence of evidence that Green was treated less favorably than employees outside his protected class, his discrimination claim fails at the *prima facie* stage.

21

The absence of evidence establishing that race was the but-for cause of the Commission's decision to terminate Green is fatal to his discrimination claim.  The motion for summary judgment, therefore, is due to be granted as to Count IV.

## VI.    CONCLUSION

Based upon the foregoing, Green fails to present a genuine dispute of material fact as to any of his claims.  Accordingly, it is

ORDERED that the motion for summary judgment, (doc. 38), is GRANTED.

A separate final judgment will be entered.

DONE this 29th day of July, 2021.

_____/s/ Emily C. Marks_____
EMILY C. MARKS
CHIEF UNITED STATES DISTRICT JUDGE